**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| EDWARD CANTRELLE and THOMAS and REBA HIXSON, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, <br><br> v. <br><br> KONINKLIJKE PHILIPS N.V.; PHILIPS NORTH AMERICA LLC; and PHILIPS RS NORTH AMERICA LLC, <br><br> *Defendants*. | **Case No.** <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Edward Cantrelle and Thomas and Reba Hixson ("Plaintiffs"), on behalf of themselves and the class of all others similarly situated as defined below, for their complaint against Defendants Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), and Philips RS North America LLC ("Philips RS") (collectively, Royal Philips, Philips NA, and Philips RS are "Philips" or the "Defendants"), allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## INTRODUCTION

1.      Plaintiffs bring this action on behalf of themselves and a proposed class of purchasers and users of Continuous Positive Airway Pressure (CPAP) and Bi-Level Positive Airway Pressure (Bi-Level PAP) devices and mechanical ventilators manufactured by Philips, which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam").

2.      On April 26, 2021, Philips made a public announcement disclosing it had determined there were risks that the PE-PUR Foam used in certain CPAP, Bi-Level PAP, and mechanical ventilator devices it manufactured may degrade or off-gas under certain circumstances.

3.     On June 14, 2021, Royal Philips issued a recall in the United States of its CPAP, Bi-Level PAP, and mechanical ventilator devices containing PE-PUR Foam, because Philips had determined that (a) the PE-PUR Foam was at risk for degradation into particles that may enter the devices' pathway and be ingested or inhaled by users, and (b) the PE-PUR Foam may off-gas certain chemicals during operation.[1] Philips further disclosed in its Recall Notice that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[2]

4.     Philips has disclosed that the absence of visible particles in the devices does not mean that PE-PUR Foam breakdown has not already begun. Philips reported that lab analysis of the degraded foam reveals the presence of harmful chemicals, including: Toluene Diamine ("TDA"), Toluene Diisocyanate ("TDI"), and Diethylene Glycol ("DEG").[3]

5.     Prior to issuing the Recall Notice, Philips received complaints regarding the presence of black debris/particles within the airpath circuit of its devices (extending from the device outlet, humidifier, tubing, and mask). Philips also received reports of headaches, upper airway irritation, cough, chest pressure and sinus infection from users of these devices.

6.     In its Recall Notice, Philips disclosed that the potential risks of particulate exposure to users of these devices include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing of PE-PUR Foam

---

[1] *See* Philips Recall Notice attached hereto as Exhibit "A."

[2] *Id.*

[3] Philips Sleep and Respiratory Care Update; Clinical information for physicians, https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed September 27, 2021).

in these devices include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects.

7.      Philips recommended that patients using the recalled CPAP and Bi-Level PAP devices immediately discontinue using their devices and that patients using the recalled ventilators for life-sustaining therapy consult with their physicians regarding alternative ventilator options.

8.      On or about 2018, Plaintiff Edward Cantrelle purchased a Philips DreamStation Auto CPAP device, model DSX700H11C, which he has used nightly since the date of receipt.

9.      Plaintiff Edward Cantrelle used his Dreamstation Auto CPAP device nightly to treat a health condition since the date of receipt.

10.     As a result of the health risks associated with continued use of his device and the recall, Plaintiff Edward Cantrelle's DreamStation Auto CPAP device is now worthless, and Plaintiff Cantrelle must now incur substantial expenses to replace the device.

11.     After Plaintiff Edward Cantrelle learned that various Philips' CPAP devices were subject to a recall due to the presence of a dangerous PE-PUR Foam that could cause him to suffer from adverse health effects, including, *inter alia*, cancer and organ failure, he was advised to verify whether his device was subject to the recall by submitting the serial number for his device to an online database Philips established. Plaintiff Edward Cantrelle received confirmation that his CPAP device was subject to recall.

12.     Plaintiff Edward Cantrelle will now incur substantial expenses to replace the device. In addition, since being notified of the recall, Plaintiff Edward Cantrelle has experienced anxiety concerning the potential serious health risks he is facing from possible exposure to off-gassed or degraded PE-PUR Foam in the recalled devices.

13.     On or about May 2, 2019, Plaintiff Thomas Hixson purchased a Philips DreamStation Auto CPAP device, model DSX200H11C, which he has used nightly since the date of receipt.

14.     Plaintiff Thomas Hixson used his Dreamstation Auto CPAP device nightly to treat a health condition since the date of receipt.

15.     As a result of the health risks associated with continued use of his device and the recall, Plaintiff Thomas Hixson's DreamStation Auto CPAP device is now worthless, and Plaintiff Thomas Hixson must now incur substantial expenses to replace the device.

16.     After Plaintiff Thomas Hixson learned that various Philips' CPAP devices were subject to a recall due to the presence of a dangerous PE-PUR Foam that could cause him to suffer from adverse health effects, including, *inter alia*, cancer and organ failure, he was advised to verify whether his device was subject to the recall by submitting the serial number for his device to an online database Philips established. Plaintiff Hixson received confirmation that his CPAP device was subject to recall.

17.     Plaintiff Thomas Hixson has experienced shortness of breath and fatigue and was diagnosed with lung cancer during his use of the Philips' CPAP machine. In addition, Plaintiff Thomas Hixson will now incur substantial expenses to replace the device.

18.     Plaintiffs seek to recover damages based on, *inter alia*, Philips' defective construction or composition, defective design, inadequate warning, breach of express warning and redhibition in connection with its manufacture, marketing and sales of devices containing PE-PUR Foam on behalf of themselves and the proposed Class.

19.     In conjunction with Plaintiff Thomas Hixson's claim, Plaintiff Reba Hixson, spouse of Thomas Hixson, asserts a claim for loss of consortium.

4

## **PARTIES**

20.     Plaintiff Edward Cantrelle is a citizen of the State of Louisiana.

21.     Plaintiffs Thomas and Reba Hixson are citizens of the State of Louisiana.

22.     Defendant Royal Philips is a Dutch multinational corporation with its principal place of business located in Amsterdam, Netherlands. Royal Philips is the parent company of the Philips Group of healthcare technology businesses, including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries Philips NA and Philips RS.[4] Upon information and belief, Royal Philips controls Philips NA and Philips RS in the manufacturing, selling, distributing, and supplying of the recalled CPAP, Bi-Level PAP, and mechanical ventilator devices.[5]

23.     Defendant Philips NA is a Delaware corporation with its principal place of business located at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips.

24.     Defendant Philips RS is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS is a wholly-owned subsidiary of Royal Philips. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[6]

---

[4] Philips 2020 annual filing with the SEC, fn. 8, https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (accessed September 27, 2021).

[5] Philips 2020 annual filing with the SEC, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (accessed September 27, 2021).

[6] Philips announces completion of tender offer to acquire Respironics, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (accessed September 27, 2021).

## JURISDICTION AND VENUE

25.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendants, and (4) there are more than 100 class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

26.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendants transact business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and because the Defendants caused harm to class members residing in this District.

27.     The Court has personal jurisdiction over the Defendants because Defendants conduct substantial business in this District, and the events giving rise to Plaintiffs' claims arise out of and relate to Defendants' contacts with this District. Further, Defendants have transacted business, maintained substantial contacts, purposefully targeted consumers and medical professionals for sales of its devices and/or committed overt acts in furtherance of the unlawful acts alleged in this Complaint in this District, as well as throughout the United States. The unlawful acts of Defendants have been directed at, targeted, and have had the effect of causing injury to persons residing in, located in, or doing business in this District, as well as throughout the United States.

## FACTUAL BACKGROUND

### I.  Continuous Positive Airway Pressure Therapy

28.    Continuous Positive Airway Pressure ("CPAP") therapy is a common nonsurgical treatment primarily used to treat sleep apnea. CPAP therapy typically involves the use of a hose and a nasal or facemask device that delivers constant and steady air pressure to an individual's throat to help individuals breathe.

29.    Sleep apnea is a common sleep disorder characterized by repeated interruptions in breathing throughout an individual's sleep cycle. These interruptions, called "apneas," are caused when the soft tissue in an individual's airway collapses. The airway collapse prevents oxygen from reaching the individual's lungs which can cause a buildup of carbon dioxide. If the individual's brain senses the buildup of carbon dioxide, it will briefly rouse the individual from sleep so that the individual's airway can reopen. Often these interruptions are so brief that the individual will not remember. Despite the brevity of the interruptions, the sleep cycle disruption caused by sleep apnea can dramatically impact a person's lifestyle, including negatively impacting energy, mental performance, and long-term health. CPAP therapy helps treat sleep apnea by preventing the person's airway from collapsing while breathing during sleep cycles, which can help prevent interruptions in breathing.

### II.  Bi-Level Positive Airway Pressure Therapy

30.    Bi-Level Positive Airway Pressure ("BiPAP") therapy is a common alternative to CPAP therapy for treating sleep apnea. Similar to CPAP therapy, BiPAP therapy is nonsurgical and involves the use of a nasal or facemask device to maintain air pressure in an individual's airway. BiPAP therapy is distinguishable from CPAP therapy, however, because Bi-Level PAP devices deliver two alternating levels—inspiratory and expiratory—of pressurized air into a

person's airway, rather than the single continuous level of pressurized air delivered by a CPAP device. The inspiratory positive airway pressure assists a person as a breath is taken in. Conversely, the expiratory positive airway pressure is applied to allow a person to comfortably breathe out. Bi-Level PAP devices deliver one level of pressurize air (the inspiratory positive level) to assist as a person inhales, and another level (the expiratory level) as a person exhales.

### III.    <u>Mechanical Ventilation</u>

31.    Mechanical ventilation is a treatment to help a person breathe when they find it difficult or are unable to breathe on their own. A mechanical ventilator pushes airflow into the patient's lungs to help them breathe. Mechanical ventilation may be invasive ventilation with a tube inserted into the patient's airway, performed in the intensive care unit in the hospital or a long-term institutional setting. Non-invasive ventilation can be used at home by people with respiratory difficulties.

## <u>SUBSTANTIVE ALLEGATIONS</u>

32.    Philips developed, marketed, and sold a variety of CPAP and Bi-Level PAP respirator devices and mechanical ventilators under its "Sleep & Respiratory Care" segment of its business designed to assist individuals with a number of sleep, breathing, and respiratory conditions, including obstructive sleep apnea, central sleep apnea, complex sleep apnea syndrome, and Chronic Obstructive Pulmonary Disease (COPD), as well as to assist those individuals requiring invasive and non-invasive ventilators for acute and sub-acute hospital environments. Philips' CPAP and Bi-Level PAP respirator devices and its mechanical ventilators typically cost several hundred, if not thousands of dollars. Philips has sold millions of these devices in the United States.

### IV.    Philips Sleep & Respiratory Care Devices Endangered Users

33.    On April 26, 2021, in its Quarterly Report for Q1 2021, Philips disclosed for the first time, under a section entitled "Regulatory Update," that device user reports had led to a discovery that the type of PE-PUR Foam Philips used to minimize noise in several CPAP and Bi-Level PAP respirators and mechanical ventilators posed health risks to its users. Specifically, Philips disclosed that "the [PE-PUR] foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone[], and certain environmental conditions involving high humidity and temperature."[7]

34.    Seven weeks later, on June 14, 2021, Philips announced a recall of numerous models of CPAP and Bi-Level PAP devices, as well as a variety of its mechanical ventilators "to address identified potential health risks related to the polyester-based polyurethane (PE-PUR) sound abatement foam component in these devices."[8] Specifically, Philip announced that it had determined that the "PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals."[9] In total, Philips announced that "[b]etween 3 million and 4 million" devices are targeted in the recall.[10]

---

[7]    First    Quarter    Results,    PHILIPS    (Apr.    26,    2021),    https://www.results.philips.com/publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf (accessed September 27, 2021).

[8] *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices*, PHILIPS (June 14, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (September 27, 2021).

[9] *Id.*

[10] Associated Press, *Philips recalls ventilators, sleep apnea machines due to health risks*, NBC NEWS, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725 (accessed September 27, 2021).

35.    The list of the devices recalled by Philips (the "Recalled Devices") include:

| Philips CPAP and Bi-Level PAP Devices Manufactured Before April 26, 2021 Subject to Recall[11] | |
| --- | --- |
| **Device Name/Model Type** | **Type** |
| E30 (Emergency Use Authorization) | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| DreamStation ASV | Continuous Ventilator, Non-life Supporting |
| DreamStation ST, AVAPS | |
| SystemOne ASV4 | |
| C Series ASV | |
| C Series S/T and AVAPS | |
| OmniLab Advanced Plus | |
| SystemOne (Q Series) | Non-continuous Ventilator |
| DreamStation | |
| DreamStation GO | |
| Dorma 400 | |
| Dorma 500 | |
| REMStar SE Auto | |

| Philips Mechanical Respirator Devices Manufactured Before April 26, 2021 Subject to Recall[12] | |
| --- | --- |
| **Device Name/Model Type** | **Type** |
| Trilogy 100 Ventilator | Continuous Ventilator |
| Trilogy 200 Ventilator | |
| Garbin Plus, Aeris, LifeVentVentilator | |
| A-Series BiPAP Hybrid A30 | Continuous Ventilator, Minimum Ventilatory Support, Facility Use |
| Philips A-Series BiPAP V30 Auto | |
| Philips A-Series BiPAP A40 | Continuous Ventilator, Non-life Supporting |
| Philips A-Series BiPAP A30 | |

---

[11] Recall Notice (Exhibit "A" hereto); *see also* Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed September 27, 2021); Royal Philips Update on the recall notification, https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (accessed September 27, 2021).

[12] *Id.*

36.    According to Philips, the PE-PUR Foam used in Recalled Devices puts users at risk of suffering from: "[i]rritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects."[13]

37.    Philips reported to physicians that PE-PUR Foam particles "may cause irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve."[14]

38.    Further, Philips reported that "based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment."[15]

39.    Philips announced that it has received reports of specific complaints from users of Recalled Devices who suffered from "headache[s], upper airway irritation, cough, chest pressure and sinus infection."[16]

## V.    The Health Risks Associated with Use of the Recalled Devices Renders Them Worthless

40.    As a result of the health risks associated with the use of the Recalled Devices, together with Defendants' concealment of these risks from the date they were first reported to

---

[13] *Id.*

[14] Philips *Sleep and Respiratory Care Update – Clinical information for physicians*, June 14, 2021, philips-recall-clinical-information-for-physicians-and-providers.pdf (accessed September 27, 2021).

[15] *Id.*

[16] Recall Notice (Exhibit "A" hereto).

Defendants or discovered by Defendants through April 26, 2021, the Recalled Devices have been rendered completely worthless or, at the very least, have been substantially diminished in value.

41.     The information described above, including the now-known health risks of Philips CPAP devices, Bi-Level PAP devices and mechanical ventilators, the recall, and the medical warnings and advice issued by Philips, have rendered the Recalled Devices worthless to patients with sleep apnea and respiratory conditions. Individuals not using life-supporting ventilators must immediately discontinue their user of the Recalled Devices or face serious health risks as grave as organ failure or cancer. If they choose to discontinue use of the Recalled Devices they must pay for another expensive device in order to receive effective treatment for their sleep apnea and/or respiratory conditions. Individuals using life-supporting ventilators must seek an alternative treatment before discontinuing use of the Recalled Devices.

42.     Recognizing this, Philips issued the following advice to patients using any of the Recalled Devices:

- "**For patients using BiLevel PAP and CPAP devices:** Discontinue use of affected units and consult with physicians to determine the benefits of continuing therapy and potential risks."[17]

- "**For patients using life-sustaining mechanical ventilator devices: DO NOT discontinue or alter prescribed therapy, without consulting physicians to determine appropriate next steps.**"[18]

43.     As a result of the above, Plaintiffs and the Class will have to undertake considerable expense replacing the Recalled Devices.

---

[17] Medical Device recall notification (U.S. only) / field safety notice (International Markets), PHILIPS RESPIRONICS (June 14, 2021), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update#section_2 (accessed September 27, 2021) (Questions and answers) (emphasis in original).

[18] *Id.*

## VI.    <u>Philips Unreasonably Delayed its Recall</u>

44.    At no time prior to its Regulatory Update on April 26, 2021, did Philips disclose to purchasers or users of the Recalled Devices that the PE-PUR Foam contained therein may off-gas or degrade upon use. Similarly, prior to the Update, Philips did not disclose any health risks associated with use of the Recalled Devices.

45.    Defendants have not disclosed when they first discovered or received reports from users of their Sleep & Respiratory Care devices "regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[19]

46.    At a minimum, as a result of user reports, Defendants were aware of the off-gassing and degradation of the PE-PUR Foam used in the Recalled Devices at some point prior to the recall, yet continued to manufacture and sell the Recalled Devices with such awareness. During this period, Defendants unreasonably and unjustly profited from the manufacture and sale of the Recalled Devices and unreasonably put users of the Recalled Devices at risk of development of serious adverse health effects, including organ failure and cancer.

## VII.    <u>Plaintiff Edward Cantrelle</u>

47.    Plaintiff Edward Cantrelle is a resident of Lafitte in Jefferson Parish, Louisiana.

48.    Plaintiff Edward Cantrelle purchased one of the Recalled Devices, a Philips DreamStation Auto CPAP device, prior to June 14, 2021.

49.    The manual accompanying Plaintiff Edward Cantrelle's DreamStation Auto CPAP device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma,

---

[19] Recall Notice (Exhibit "A" hereto).

adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects. Had Defendants informed Plaintiff of these risks, he would not have purchased the Recalled Device.

50.    Without knowing of the health risks associated with use of the Recalled Device, Plaintiff Edward Cantrelle used his Recalled Device nightly to treat sleep apnea.

51.    As a result of the health risks associated with continued use of these devices and the recall, Plaintiff Cantrelle's DreamStation Auto CPAP device is now worthless, and Plaintiff Cantrelle will be forced to replace the device at considerable cost.

**VIII.    Plaintiffs Thomas and Reba Hixson**

52.    Plaintiffs Thomas and Reba Hixson are residents of Alexandria in Rapides Parish, Louisiana.

53.    Plaintiff Thomas Hixson purchased one of the Recalled Devices, a Philips DreamStation Auto CPAP device, prior to June 14, 2021.

54.    The manual accompanying Plaintiff Thomas Hixson's DreamStation Auto CPAP device did not contain any language or warnings of health risks associated with use of the device, including irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (*e.g.*, kidneys and liver) and toxic carcinogenic effects. Had Defendants informed Plaintiff of these risks, he would not have purchased the Recalled Device.

55.    Without knowing of the health risks associated with use of the Recalled Device, Plaintiff Thomas Hixson used his Recalled Device nightly to treat sleep apnea.

56.    Plaintiff Thomas Hixson has experienced shortness of breath and fatigue and was diagnosed with lung cancer during his use of the Philips' CPAP machine.

57.    As a result of the health risks associated with continued use of these devices and the recall, Plaintiff Thomas Hixson's DreamStation Auto CPAP device is now worthless, and Plaintiff Hixson will be forced to replace the device at considerable cost.

**TOLLING AND ESTOPPEL**

**I.    DISCOVERY RULE TOLLING**

58.    Plaintiffs and the Class had no way of knowing about Philips' conduct with respect to the health risks associated with the use of the Recalled Devices.

59.    Neither Plaintiffs nor any other members of the Class, through the exercise of reasonable care, could have discovered the conduct by Philips alleged herein. Further, Plaintiffs and members of the Class did not discover and did not know of facts that would have caused a reasonable person to suspect that Philips was engaged in the conduct alleged herein.

60.    For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and the Class.

**II.    FRAUDULENT CONCEALMENT TOLLING**

61.    By failing to provide immediate notice of the adverse health effects associated with continued use of the Recalled Devices, Philips concealed its conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Class.

62.    Upon information and belief, Philips intended its acts to conceal the facts and claims from Plaintiffs and members of the Class. Plaintiffs and the members of the Class were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Class should be tolled.

## CORPORATE/VICARIOUS LIABILITY

63.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiffs.

64.    There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

65.    At all times herein mentioned, Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiffs. As such, each Defendant is individually, as well as jointly and severally, liable to the Plaintiffs for their damages.

66.    At all times herein mentioned, the officers and/or directors of the Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence

should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by the Plaintiffs.

## **LOSS OF CONSORTIUM**

67.    At all relevant times hereto, where applicable, Plaintiff Thomas Hixson has a spouse, Reba Hixson, who has suffered injuries and losses as a result of Plaintiff Thomas Hixson's injuries from Philips' Recalled Devices.

68.    For the reasons set forth herein, Plaintiff Thomas Hixson's spouse, Reba Hixson, has necessarily paid and has become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of similar nature in the future as a proximate result of Defendants' misconduct.

69.    For the reasons set forth herein, Plaintiff Thomas Hixson's spouse, Reba Hixson, has suffered and will continue to suffer the loss of her loved one's support, companionship, services, society, love, and affection as a proximate result of Defendants' misconduct.

70.    Plaintiffs Thomas and Reba Hixson allege that their marital relationship was impaired and depreciated, and the marital association between spouses has been altered.

71.    Plaintiff Thomas Hixson's spouse, Reba Hixson, has suffered great emotional pain and anguish.

72.    As a direct and proximate result of Defendants' misconduct, Plaintiff Thomas Hixson's spouse, Reba Hixson, has sustained and will continue to sustain severe emotional distress, economic loss, and other damages for which she is entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.  Defendants are liable to Plaintiff Thomas Hixson's spouse, Reba Hixson, jointly and severally for all general, special, and equitable relief to which the spouse of Plaintiff is entitled by law.

## CLASS ACTION ALLEGATIONS

73.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). Plaintiffs seek class certification on behalf of a Louisiana class defined as follows (the "Class"):

> **LOUISIANA CLASS**: All persons who were or are citizens of the State of Louisiana who purchased a CPAP, Bi-Level PAP, or Mechanical Ventilator device that was manufactured by Philips before April 26, 2021, and recalled by Philips on June 14, 2021.

74.    Plaintiffs reserve the right to modify or expand the definitions of the Class based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

75.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants' and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendants or their parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

76.    **Numerosity (Rule 23(a)(1))**. The Class is so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class, as herein identified and described, is not known, but sales figures and the Recall Notice indicate that millions of individuals have purchased the Recalled Devices.

77.    **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

- whether Defendants owed a duty of care to Plaintiffs and the Class;

- whether Defendants knew or should have known that the PE-PUR Foam used for sound abatement posed health risks;

- whether Defendants wrongfully represented that the PE-PUR Foam used for sound abatement in the Recalled Devices was safe;

- whether the Recalled Devices retained any value post-recall;

- whether Defendants wrongfully represented that the Recalled Devices were safe to use;

- whether Defendants wrongfully failed to disclose that the PE-PUR Foam used for sound abatement in the Recalled Devices posed health risks to Recalled Device users;

- whether Defendants' representations and omissions in advertising, warranties, packaging, and/or labeling were false, deceptive, and/or misleading;

- whether those representations and omissions were likely to deceive a reasonable consumer;

- whether a reasonable consumer would consider the presence, or risk of, health risks as a material fact in purchasing one of the Recalled Devices;

- whether Defendants had knowledge that those representations and omissions were false, deceptive, and misleading;

- whether Defendants breached their express warranties;

19

- whether Defendants breached their implied warranties;

- whether Defendants engaged in unfair trade practices;

- whether Defendants engaged in false advertising;

- whether Defendants' conduct was negligent per se;

- whether Defendants made negligent and/or fraudulent misrepresentations and/or omissions; and

- whether Plaintiff and the members of the Class are entitled to actual, statutory, and punitive damages.

78.    **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Plaintiffs and members of the Class (as applicable) suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Class.

79.    **Adequacy (Rule 23(a)(4))**. Plaintiffs' interests are aligned with the Class he seeks to represent. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained competent counsel highly experienced in complex litigation and class actions and the types of claims at issue in this litigation, with the necessary resources committed to protecting the interests of the Class. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class.

80.    **Superiority**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy, and joinder of all members of the Class is impracticable. The prosecution of separate

actions by individual members of the Class would impose heavy burdens upon the Courts and Defendants, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Class, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

81.     **Manageability.** This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

82.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CAUSE OF ACTION
## REDHIBITION UNDER LA. C.C. ART 2520

83.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

84.     The Recalled Devices contain a vice or defect which render them useless or their use so inconvenient that buyers would not have purchased them.

85.     Philips sold and promoted the Recalled Devices, which Philips placed into the stream of commerce.  Under Louisiana law, the seller warrants the buyer against redhibitory defects, or vices, in the thing sold. La. C.C. art. 2520.  The Recalled Devices, sold and promoted by Philips, possesses a redhibitory defect because they were not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which renders the subject products useless or so inconvenient that it must be presumed that a buyer would

not have bought the subject product had he known of the defect.  Pursuant to La. C.C. art. 2520, Plaintiffs and members of the Class are entitled to obtain a rescission of the sale of the Recalled Devices.

86.    The Recalled Devices alternatively possesses a redhibitory defect because the Recalled Devices were not manufactured and marketed in accordance with industry standards and/or is unreasonably dangerous, as described above, which diminishes the value of the Recalled Devices so that it must be presumed that a buyer would still have bought it but for a lesser price. In this instance, Plaintiffs and members of the Class are entitled to a reduction of the purchase price of the Recalled Devices.

87.    Philips is liable as a bad faith seller for selling a defective product with knowledge of the defect, and thus, are liable to Plaintiffs for the price of the Recalled Devices, with interest from the purchase date, as well as reasonable expenses occasioned by the sale of the Recalled Devices, and attorneys' fees.  As the manufacturer of the Recalled Devices, under Louisiana law, Philips is deemed to know that the Recalled Devices possess a redhibitory defect.  La. C.C. art. 2545.

88.    As a result of the Recalled Devices' redhibitory defects, Plaintiffs and members of the Class have suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and which they would not have purchased at all had they known of the attendant health risks associated with the use of each Recalled Device.

89.    By reason of the foregoing, Plaintiffs and the Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available thereunder for the Recalled Devices' redhibitory defects.

**SECOND CAUSE OF ACTION**
**CONSTRUCTION OR COMPOSITION DEFECT UNDER LA. R.S. 9:2800.55**
**(PRODUCTS LIABILITY)**

90.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

91.     Plaintiffs and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' defective construction or composition.

92.     At all times material to this action, Philips was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the Recalled Devices, including the DreamStation Auto CPAP device.

93.     At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiffs and the Class herein without substantial change in the condition in which it was sold.

94.     At all times material to this action, the Recalled Devices were designed, developed, manufactured, tested, packaged, promoted, marketed, distributed, labeled, and/or sold by Philips in a defective and unreasonably dangerous condition at the time they was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

      a.     When placed in the stream of commerce, the Recalled Devices contained manufacturing defects which rendered the subject product unreasonably dangerous;

      b.     The Recalled Devices' manufacturing defects occurred while the product was in the possession and existed before it left the control of Philips; and

      c.     The Recalled Devices were not made in accordance with Philips' specifications or performance standards.

95.     Philips knew or should have known of the defective nature of the Recalled Devices, including the DreamStation Auto CPAP devices used by Plaintiffs, including (among other things), that the PE-PUR foam used in the Recalled Devices' component parts was prone to flaking, chemicalization, disintegration, that it could enter the user's airways while they slept, exposing them to increased and unnecessary risk of cancer, as well as other injuries.

96.     The Recalled Devices manufactured by Philips were defective in construction or composition in that, when they left the hands of Philips, they deviated in a material way from Philips' manufacturing performance standards and/or it differed from otherwise identical products manufactured to the same design formula.  In particular, the products are not safe, have numerous and serious side effects and cause severe and permanent injuries.  The products were unreasonably dangerous in construction or composition as provided by La. R.S. 9:2800.55.

97.     As a direct and proximate result of Philips' conduct, Plaintiffs and members of the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which did not conform to the Philips' manufacturing performance standards and/or otherwise identical products' standards.

98.     As a direct and proximate result of Philips' conduct, Plaintiffs and members of the Class have suffered damages and harm, including, but not limited to, personal injury, physical pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, lost wages, and ongoing medical monitoring costs.

99.     By reason of the foregoing, Plaintiffs and members of the Class have suffered damages as alleged herein.

### THIRD CAUSE OF ACTION
### DESIGN DEFECT UNDER LA. R.S. 9:2800.56
### (PRODUCTS LIABILITY)

100.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

101.    Plaintiffs and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' defective design.

102.    The Recalled Devices are defective in their design or formulation in that they are not reasonably fit, suitable, or safe for their intended purpose and/or their foreseeable risks exceed the benefits associated with their design and formulation.  The subject products were unreasonably dangerous in design as provided by La. R.S. 9:2800.56.

103.    At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana and throughout the United States, including Plaintiffs and the Class herein, without substantial change in the condition in which they were sold.

104.    The Recalled Devices, including the DreamStation Auto CPAP devices used by Plaintiffs, were not reasonably safe for their intended uses and were defective with respect to their design. The Recalled Devices' design defects include, but are not limited to:

a.    The use of polyurethane PE-PUR sound abatement foam in the Recalled Devices, including the DreamStation Auto CPAP device and the immune reaction that results from such material, causing adverse reactions and injuries;

b.    Failing to design the Recalled Devices so as to avoid an unreasonable and increased risk of harm of cancer and other injuries in users;

c.    Including in the design of the Recalled Devices, flawed polyurethane PE-PUR sound abatement foam that could break down, flake off and/or chemicalize and

infiltrate the device's air pathway while the user is sleeping, exposing them to increased and unnecessary risk of cancer, as well as other injuries;

d.      Failing to use alternatively available sound abatement materials and/or foams in the Recalled Devices, such as plastic, silicone, or rubber, which would not break down, flake off and/or chemicalize and infiltrate the device's air pathway while the user is sleeping;

e.      Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Recalled Devices.

105.   At all times, the use of the Recalled Devices, as well as Plaintiffs' use of the Recalled Devices, was foreseeable and foreseen by Philips as they were used by Plaintiffs in the manner intended by Philips.

106.   The Recalled Devices designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Philips were defective in design and/or formulation, in that, when they left the hands of the Philips, manufacturers, and/or suppliers, they were unreasonably dangerous, and they were more dangerous than an ordinary consumer would expect.

107.   At all times herein mentioned, the Recalled Devices were in a defective condition and unsafe, and Philips knew or had reason to know that said products were defective and unsafe, especially when used in the form and manner as provided by Philips.

108.   Philips, with this knowledge, voluntarily designed the Recalled Devices in a dangerous condition for use by the public, and in particular the Plaintiffs.

109.   Philips had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

110.   Philips created a product unreasonably dangerous for its normal, intended use.

111.    The Recalled Devices, designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Philips, were manufactured defectively in that the the products left the hands of Philips in a defective condition and were unreasonably dangerous to its intended users.

112.    The Recalled Devices, designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Philips reached their intended users in the same defective and unreasonably dangerous condition in which they were manufactured.

113.    In addition, at the time the Recalled Devices left the control of Philips, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiffs' injuries without impairing the reasonably anticipated or intended function of the product.  These safer alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiffs' injuries without substantially impairing the product's utility.

114.    The Plaintiffs could not, by the exercise of reasonable care, have discovered the Recalled Devices' defects herein mentioned and perceived its danger.

115.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which they would not have purchased at all had they known of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which were defective and unsafe.

116.    As a direct and proximate result of Philips' conduct, Plaintiffs and members of the Class have suffered damages and harm, including, but not limited to, personal injury, physical pain

and suffering, mental anguish, medical expenses, loss of enjoyment of life, lost wages, and ongoing medical monitoring costs.

117.    By reason of the foregoing, Plaintiffs and the Class have suffered damages as alleged herein.

### FOURTH CAUSE OF ACTION
### INADEQUATE WARNING UNDER LA. R.S. 9:2800.57
### (PRODUCTS LIABILITY)

118.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

119.    Plaintiffs and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' inadequate warning.

120.    The Recalled Devices were defective and unreasonably dangerous when they left the possession of Philips in that they contained warnings insufficient to alert consumers, including Plaintiffs herein, and their health care providers, of the dangerous risks and reactions associated with the subject products, including but not limited to their propensity to cause permanent physical injuries and side effects, notwithstanding Philips' knowledge of an increased risk of these injuries and side effects.  Thus, the subject products were unreasonably dangerous because an adequate warning was not provided as provided pursuant to La. R.S. 9:2800.57.

121.    The Recalled Devices manufactured and supplied by Philips were defective due to inadequate post-marketing warning or instruction because, after Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe, Philips failed to provide an adequate warning to consumers and/or their health care providers of the defects of the products, and/or alternatively failed to conform to federal and/or state requirements for labeling, warnings and instructions, or recall, while knowing that the products could cause serious injury.

122.    Plaintiffs were prescribed and used the Recalled Devices for their intended purpose.

123.    Plaintiffs could not have discovered any defect in the subject products through the exercise of reasonable care.

124.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the warnings were not accurate, clear and/or were ambiguous.

125.    Philips' warnings and its omissions were material, and Plaintiffs and members of the Class reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

126.    Philips had a continuing duty to warn Plaintiffs of the dangers associated with the subject products.

127.    Had Plaintiffs received adequate warnings regarding the risks of the subject product, they would not have purchased it.

128.    As a direct and proximate result of Philips' conduct, Plaintiffs and the Class have suffered actual damages in that they purchased the Recalled Devices (a) that were worth less than the price they paid, (b) which labels, warnings, and packaging did not provide an adequate warning of the health risks, including organ failure and cancer, associated with the use of the Recalled Devices, and (c) which they would not have purchased at all had they been warned of these health risks.

129.    As a direct and proximate result of Philips' conduct, Plaintiffs and members of the Class have suffered damages and harm, including, but not limited to, personal injury, physical pain and suffering, mental anguish, medical expenses, loss of enjoyment of life, lost wages, and ongoing medical monitoring costs.

130.    By reason of the foregoing, Plaintiffs and the Class have suffered damages as alleged herein.

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY UNDER LA. R.S. 9:2800.58
## (PRODUCTS LIABILITY)

131.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

132.    Plaintiffs and members of the Class assert they are entitled to relief and recovery under the LPLA for Philips' breach of express warranty.

133.    At all times material to this action, the Recalled Devices were expected to reach, and did reach, consumers in the State of Louisiana, including Plaintiffs and the members of the Class herein without substantial change in the condition in which they were sold.

134.    Philips expressly warranted, advertised, and represented to Plaintiffs and the Class that the Recalled Devices were safe and appropriate for human use.

135.    Philips made these express warranties regarding the Recalled Devices' quality and fitness for use in writing through its website, advertisements, and marketing materials, and on the Recalled Devices' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiffs and the Class entered into upon purchasing the Recalled Devices.

136.    Philips' advertisements, warranties, representations, and omissions regarding health risks associated with the Recalled Devices, were made in connection with the sale of the Recalled Devices to Plaintiffs and the Class. Plaintiffs and the Class relied on Philips' advertisements, warranties, representations, and omissions regarding the Recalled Devices in deciding whether to purchase and use Philips' Recalled Devices.

137.    Philips' Recalled Devices do not conform to Philips' advertisements, warranties, representations, and omissions in that they are not safe, healthy, and appropriate for human use, and pose risks of serious injury and disease, including organ failure and cancer.

138.    Philips therefore breached its express warranties under La. R.S. 9:2800:58 by placing Recalled Devices into the stream of commerce and selling them to consumers, when their use posed health risks, had dangerous effects and were unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Philips. These associated health effects substantially impair the use, value, safety of the Recalled Devices, and render them worthless.

139.    Philips was aware, or should have been aware, of the toxic or dangerous health effects of the use of the Recalled Devices, but nowhere on the package labeling or package inserts or on Philips' websites or other marketing materials did Philips warn Plaintiffs and members of the Class that they were at risk of developing adverse health effects as a result of the dangerous PE-PUR Foam used in the Recalled Devices.

140.    Instead, Philips concealed the dangerous health effects of the PE-PUR Foam used in the Recalled Devices and deceptively represented that these products were safe, healthy, and appropriate for use, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for sleep apnea, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use. Philips thus utterly failed to ensure that the material representations they were making to consumers were true.

141.    The adverse health effects associated with use of the Recalled Devices existed when they left Philips' possession or control and were sold to Plaintiffs and members of the Class. The

dangers associated with use of the Recalled Devices were undiscoverable by Plaintiffs and members of the Class at the time of purchase of the Recalled Devices.

142.    As manufacturers, marketers, advertisers, distributors and sellers of the Recalled Devices, Philips had exclusive knowledge and notice of the fact that the Recalled Devices did not conform to the affirmations of fact and promises.

143.    In addition, or in the alternative, to the formation of an express contract, Philips made each of the above-described representations and omissions to induce Plaintiffs and members of the Class to rely on such representations and omissions.

144.    Philips' affirmations of fact and promises and its omissions were material, and Plaintiffs and members of the Class reasonably relied upon such representations and omissions in purchasing and using the Recalled Devices.

145.    All conditions precedent to Philips' liability for its breach of express warranty have been performed by Plaintiffs or members of the Class.

146.    Philips was placed on reasonable notice from user reports and its lab testing that the PE-PUR Foam in the Recalled Devices was unsafe. Philips had ample opportunity either to stop using the PE-PUR Foam or to replace the PE-PUR Foam in the Recalled Devices to make them safe and healthy for use by Plaintiffs and members of the Class, but failed to do so until now.

147.    As a direct and proximate result of Philips' breaches of express warranty, Plaintiffs and members of the Class have been damaged because they did not receive the products as specifically warranted by Philips. Plaintiffs and members of the Class did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Recalled Devices.

148.   By reason of the foregoing, Plaintiffs and members of the Class seek actual damages and any other just and proper relief available thereunder for Philips' failure to deliver goods conforming to their express warranties and resulting breach.

## SIXTH CAUSE OF ACTION
## LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### La. Rev. Stat. Ann. § § 51:1401, *et seq.*

149.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

150.   In the alternative, Plaintiffs and members of the Class assert they are entitled to relief and recovery under the Louisiana Unfair Trade Practices Act ("LUTPA") as provided for in La. Rev. Stat. Ann. §§ 51:1401 *et seq*.

151.   At all times mentioned herein, Philips engaged in "trade" or "commerce" in Louisiana, as defined by La. R.S. § 51:1402(10), in that they advertised, offered for sale, and sold goods, property, or services primarily for personal, family, or household purposes, and advertised, solicited, offered for sale, and sold "services," "property," "article[s]," "commodit[ies]," or "thing[s] of value" in Louisiana.

152.   LUPTA, La. Rev. Stat. Ann. § 51:1405(A) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

153.   For the reasons discussed herein, Philips violated and continues to violate the LUPTA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by La. Rev. Stat. Ann. §§ 51:1401 *et seq*. Philips' acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

154.     Philips repeatedly advertised on the labels and packing for the Recalled Devices, on Philips' websites, and through national advertising campaigns, among other items, that the Recalled Devices were safe and fit for human use. Philips failed to disclose the material information that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use.

155.     Philips' representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase and use the Recalled Devices without being aware that the PE-PUR Foam used in the Recalled Devices, and therefore the Recalled Devices themselves, were unsafe and unfit for human use. As a direct and proximate result of Philips' unfair and deceptive acts or practices, Plaintiffs and the Class Members suffered damages by purchasing the Recalled Devices because they would not have purchased the Recalled Devices had they known the truth, and they received a product that was worthless because it contains unsafe PEPUR Foam which can cause a number of adverse health effects, including organ failure and cancer.

156.     Philips' deceptive trade practices caused injury in fact and actual damages to Plaintiffs and members of the Class in the form of the loss or diminishment of value of the Recalled Devices that Plaintiffs and Class Members purchased, which allowed Defendants to profit at the expense of Plaintiffs and Class Members. The injuries Plaintiffs and Class Members sustained were to legally protected interests. The gravity of the harm of Philips' actions is significant and there is no corresponding benefit to consumers of such conduct.

157.     Plaintiffs and Class Members seek relief for the injuries they have suffered as a result of Defendants' unfair and deceptive acts and practices, as provided by La. Rev. Stat. Ann. § 51:1409 and applicable law.

34

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Philips as to each and every count, including:

A.    An order certifying this action and the Class requested herein as a class action, designating Plaintiffs as the representative of the Class, and appointing Plaintiffs' counsel as counsel to the Class;

B.    An order declaring that Philips' actions constitute: (i) a redhibitory defect; or in the alternative, (ii) construction or composition defect; (iii) design defect; (iv) inadequate warning; (v) breach of express warranty; and (vi) unfair and deceptive business practices in violation of Louisiana consumer protection statutes, and that Philips is liable to Plaintiffs and the Class, as described herein, for damages arising therefrom;

C.    A judgment awarding Plaintiffs and members of the Class all appropriate damages in an amount to be determined at trial;

E.    A judgment awarding Plaintiffs and the Class prejudgment and post-judgment interest, as permitted by law;

F.    A judgment awarding Plaintiffs and the Class costs and fees, including attorneys' fees, as permitted by law; and

G.    Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues.


DATED: September 30, 2021          Respectfully submitted,

*/s/ Claire E. Berg*
Gerald E. Meunier (#9471)
M. Palmer Lambert (#33228)
Claire E. Berg (#37029)
GAINSBURGH, BENJAMIN, DAVID,
MEUNIER & WARSHAUER L.L.C.
2800 Entergy Centre
1100 Poydras Street
New Orleans, LA 70163
Phone: (504) 522-2304
Fax: (504) 528-9973
gmenuier@gainben.com
plambert@gainsben.com
cberg@gainsben.com